UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE DISPLAY SHOP, INC.,
a Michigan corporation,

    Plaintiff,

v.

Case No. 09-11300

Hon. John Corbett O'Meara

VAUGHN ASSOCIATES, INC.,
a foreign corporation,

    Defendant.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a breach of contract action. Plaintiff, The Display Shop, Inc. ("DSI"), primarily alleges that Vaughn Associates, Inc. ("Vaughn"), breached an agreement to pay for certain retail displays DSI produced for Kmart. Vaughn denies that any such agreement was made between the parties.

A bench trial was held on August 31, 2010, and the parties submitted proposed findings of fact and conclusions of law on September 3, 2010. After considering the testimony of witnesses, admitted exhibits, and designated deposition testimony, and analyzing the claims and defenses of the parties, the court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.

## FINDINGS OF FACT

1. DSI, which is owned and operated by Sam Gatto, sells displays and racks used in retail stores.

2. Vaughn is a manufacturers' representative for manufacturers of toys and other

products. Vaughn places its clients' merchandise for sale at Kmart, among other retailers.

3. Kevin Robertson works as a sales representative for Vaughn and has placed merchandise for clients at Kmart. Robertson's contact at Kmart was Nicole (Olles) Jonasson, a buyer in the toy department.

4. Sometime in February 2008, Robertson contacted Gatto at DSI about creating displays ("bubble displays" or "bubble racks") for Kmart and Sears stores as part of a program for selling small, inexpensive toys ("Bubble Program").

5. Robertson was responsible for lining up manufacturers to sell toys that would be displayed in the bubble racks, which consisted of two columns of clear plastic bowls or "bubbles" mounted to a backing board.

6. DSI's role was to produce the bubble displays, pack them with toys from the manufacturers obtained by Robertson, and ship them to Kmart and Sears.

7. Initially, Kmart was going to purchase the displays. Ultimately, however, the parties agreed that the toy manufacturers would cover the cost of the displays by paying an "entry" or "slotting" fee to DSI. See Gatto TR at 56; Deniese Meyer Dep. at 10-11, 13-14; Nicole Jonasson Dep. at 15-16. This is the typical arrangement in the industry for paying for retail displays. See Gatto TR at 56; Robertson TR at 28-29.[1]

---

[1] DSI argues that, at a meeting between Vaughn, DSI, and Kmart in June 2008, Robertson agreed that Vaughn would be responsible for the cost of the displays. See Ex. 54. The court credits the testimony of Robertson that this meeting and agreement did not occur. See Robertson TR at 32; Jonasson Dep. at 15-16; Meyer Dep. at 10-14. The court would come to this conclusion even if it considered Exhibit 54, an email from Gatto confirming the alleged

8.  DSI would also receive a handling fee of twenty cents per toy from Kmart. Kmart would pay DSI for the toys on a "scanned" or consignment basis, meaning that Kmart would pay DSI every two weeks, as the toys were sold.

9.  Although DSI would be paid by Kmart on a "scan-based trading" ("SBT") basis, Robertson and Gatto initially understood that DSI would pay the toy manufacturers within 60 days of DSI's receipt of the product. See Ex. 3; Gatto TR at 62.

10. When Robertson solicited factories to participate in the Bubble Program, he represented that they would need to pay a slotting fee and that they would be paid for the product within 60 days of shipment. Based upon these representations, he secured three factories to participate: Funtastic, U.S. Foam, and Say What Enterprises. These factories agreed to pay a total of $37,000 in slotting fees.

11. Robertson also worked on lining up additional factories to participate in the program.

12. In July 2008, DSI issued purchase orders to the factories for toys to be included in the bubble displays. The purchase orders indicated that the terms were "SBT" rather than the 60 days Robertson had represented to the factories. See Gatto TR at 63. The factories shipped toys to DSI.

13. In August 2008, DSI sent invoices to the participating factories for their slotting allowances. See Exs. 9, 10.

14. Robertson was not aware that DSI had changed the payment terms to the factories

---

agreement. The court finds, however, that Exhibit 54 is hearsay and should not be considered.

from 60 days to SBT until September 2008. Robertson TR at 29-31.

15. Once the factories were aware of the SBT payment terms, they declined to continue to participate in the program. This is because it was not economically feasible for the factories to wait to be paid for their products as the products were sold at Kmart. See Robertson TR at 29-31, 39-40.

16. Robertson attempted to get other factories to participate in the Bubble Program, but was unable to do so as a result of the SBT payment terms. See Robertson TR at 39-40; Exs. 23, 24; Gatto TR at 36.

17. Meanwhile, without factories to continue participating in the program, DSI was not being paid for the bubble displays. See Exs. 37, 39. The factories did not pay the slotting fees. Gatto TR at 44.

18. Although Robertson made efforts to get factories to participate in the Bubble Program, he was unsuccessful. In December 2008, Gatto declined to work with Robertson and Vaughn Associates on the Bubble Program and worked directly with Kmart instead.

19. DSI contends that it never received payment for the bubble displays.

20. DSI also contends that, because of billing errors, it did not receive the twenty-cent handling fee per toy, resulting in a loss of approximately $6500.

21. Debbie Nay testified that Robertson was responsible for inputting the pricing information into the Kmart system and that the price DSI received from Kmart for each toy was less than it should have been. Nay TR at 3-8.

22. Robertson testified that he was unaware that he was to add a twenty-cent handling

fee to the price of the toys in the Kmart system. Robertson TR at 33-34, 35-37.

23. Nay testified that, based upon her review of DSI's business records, the total loss to DSI as a result of the alleged pricing errors was $6,509.01. Id.

24. The business records upon which Nay relied, however, were not admitted into evidence. Documents submitted to the court indicate that DSI's calculation of the loss resulting from the pricing errors was at one time $9,230.22. See Exs. 51, 52, 55. This discrepancy was not explained at trial.

## CONCLUSIONS OF LAW

25. The court has diversity jurisdiction over this matter, in that parties are completely diverse and the amount in controversy is over $75,000. See Gatto TR at 74 (testifying DSI was never paid for the displays, which cost approximately $113,000); First Amended Compl. at ¶¶ 1-2.

26. The parties agree that Plaintiff's breach of contract claims are governed by Michigan law.

27. "To state a breach of contract claim under Michigan law, a plaintiff must first establish the elements of a valid contract. The elements of a valid contract in Michigan are 1) parties competent to contract, 2) a proper subject matter, 3) a legal consideration, 4) mutuality of agreement, and 5) mutuality of obligation. Once a valid contract has been established, a plaintiff seeking to recover on a breach of contract theory must then prove by a preponderance of the evidence the terms of the contract, that the defendant breached the terms of the contract, and that the breached caused the plaintiff's injury." In re Brown, 342 F.3d 620 (6th Cir.

2003) (citing <u>Pawlak v. Redox Corp</u>., 182 Mich. App. 758 (1990), <u>Thomas v. Leja</u>, 187 Mich. App. 418 (1990)).

28. "It is hornbook law that a valid contract requires a 'meeting of the minds' on all the essential terms. . . . A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." <u>Kamalnath v. Mercy Mem. Hosp. Corp.</u>, 194 Mich. App. 543, 548 (1992) (citations omitted).

29. The court concludes that DSI cannot prevail upon its breach of contract claim with respect to the bubble displays, because Robertson and Vaughn Associates did not agree to pay for or purchase the racks. <u>See</u> Robertson TR at 32; Gatto TR at 58. Rather, the evidence shows that the parties expected the factories to pay slotting fees that would cover the cost of the displays. <u>Id.</u>; <u>see also</u> Gatto TR at 56; Deniese Meyer Dep. at 10-11, 13-14; Nicole Jonasson Dep. at 15-16.

30. The court also finds that DSI cannot prevail upon its claim with respect to pricing errors. DSI has not proven by a preponderance of the evidence that Vaughn breached an agreement with DSI to include a twenty-cent handling fee in the cost of the toys inputted into the Kmart system. In addition, the court finds that DSI has not sufficiently supported the amount of damages that it seeks, as it provided the court no documentation demonstrating the amount of toys it sold and the price. The court is unable to fully credit Ms. Nay's testimony regarding the amount of damages without the underlying documentation, particularly in light of the fact that DSI's damages figure has not been consistent. <u>See</u> Exs. 51, 52, 55.

31. The court will enter judgment in favor of Defendant.

**SO ORDERED.**

s/John Corbett O'Meara<br>United States District Judge

Date: October 21, 2010

 

I hereby certify that a copy of the foregoing document was served upon counsel of record on this date, October 21, 2010, using the ECF system.

s/William Barkholz<br>Case Manager